**Jerry Lee REESE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 14596.**

United States Court of Appeals Ninth Circuit.

Aug. 22, 1955.

Rehearing Denied Sept. 29, 1955.

J. B. Tietz, Los Angeles, Cal., Hayden C. Covington, Brooklyn, N. Y., for appellant.

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., James S. Eddy, Sacramento, Cal., Richard H. Foster, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before HEALY, BONE and ORR, Circuit Judges.

BONE, Circuit Judge.

Appellant was indicted on July 21, 1954 and tried and convicted without a jury under a single count charging that he failed to report to his local draft board for instructions to proceed to a place of employment for the purpose of civilian work contributing to the maintenance of the national health, safety and interest. His local draft board had classified him as 1-A. On appeal to the Appeal Board that board classified him 1-O, i. e., conscientious objector available for such civilian work. Code of Federal Regulations, Title 32, Section 1622.14.[1]

Appellant presents two specifications of error, (1) the failure of the trial court to grant his motion for judgment of acquittal made at the close of all the evidence, and (2) in convicting him and entering judgment of guilt.

In general, his claim here is that he presented substantial evidence *to the local board,* which was not rebutted, and which sustained his claim that he was *both* a regular and an ordained minister of a recognized sect which did not compensate its ministers, and that he was entitled to receive the more favorable minister's classification instead of a 1-O classification. The first claim of error is naturally embraced within the second claim and we therefore look to the record of trial proceedings and the Selective Service System file record for the information upon which his claims are based.

At the outset he emphasizes the argument that denial of a claim of ministerial status was *due* to the fact that when he appeared before the local board on December 10, 1951, an individual member asked him if he had "attended or graduated from a recognized Theological Seminary or Bible Institute." The board minutes state that his answer was "No" —that he *only* attended High School and graduated from High School. He was there advised of his right to appeal if the local board retained him in 1-A. He did appeal.

The burden of his argument here is that the mere asking of this question by the local board member (without more) "makes apparent" that *his failure to have attended or graduated from* either of such named religious institutions necessarily became *the legal basis* of the board's rejection of his claim that he was *both* a regular and an ordained minister. It is on this basis that he urges that it becomes our duty to hold that this casual question (in some undisclosed manner) caused the entire membership of that board (and later the Appeal Board) to adopt and apply what he characterizes as an "illegal standard" in appraising and denying his claim of ministerial status.

To support this "illegal standard" argument appellant cites several cases to the general effect that if a local board *uses* an illegal standard in classifying a registrant such use invalidates its classification—here—1-A. This argument also overlooks the overriding and superseding effect of a later and different classification by the Appeal Board which (with his record file before it) changed his classification to 1-O.

As we have noted, appellant also attributes to the Appeal Board the application of the same claimed "illegal standard" when it later classified him as a conscientious objector. His argument on

1. It was stipulated at trial that on February 14, 1954 appellant was ordered to report to the local board for the work he had been ordered to do by the board. The specific charge in the indictment is that he knowingly refused and failed to comply with this order to so "report," this refusal and failure occurring on February 26, 1954. The *refusal* to report is not questioned in the case. As a matter of record the selective service file shows that the board order to report to it was mailed on February 15, 1954.

this point is vague and tenuous. The record is silent as to just what ultimate conclusion may have moved the Appeal Board to give him a 1-O classification, and his argument serves only to invite conjecture and sheer speculation on our part. All that is possible to distill from this bare contention in his brief is that we should *infer* from a silent record that the Appeal Board also saw fit to apply the rule which was applied by the local board in the later noted Kezmes case, but there is no factual basis in the record to justify such a conclusion or to support such an inference. He admitted receiving notice from the Appeal Board that it had classified him as 1-O.

As to his primary contention above noted, he pinpoints his argument by relying on a recent decision which he assures us is "squarely in point" on this issue— United States v. Kezmes, D.C., 125 F. Supp. 300. The court's opinion in that case indicates that it reluctantly granted a motion for judgment of acquittal upon the ground that the *standard* the local board there obviously applied was erroneous under the doctrine of Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132. The opinion quotes the language of the local board wherein it plainly appears that it *unanimously* refused to grant a IV-D classification *on the formally stated ground* that " 'in as much as you have no college education or theological training, we couldn't consider you a minister in full time capacity or otherwise.' " [125 F.Supp. 301] This formal and unequivocal holding by a local board in the Kezmes case is a far cry from the record before us because the record in that case baldly reveals the exact but erroneous basis of local board action.

■ To argue that in the instant case that *both* the local board and the Appeal Board deliberately adopted and applied the rule condemned in Kezmes and *thus* erroneously made this "rule" the legal basis for rejecting appellant's claim to ministerial status, is not only a contention wholly void of support in the record but clearly distorts the record.

The mere asking of the challenged question is not indubitable proof, or any kind of proof, that the local board applied the condemned rule, or that the Appeal Board also adopted it when its classification superseded that fixed by the local board. The noted contention is therefore rejected as untenable.

### The Selective Service Record

That in the performance of its duty some sort of an inquiry of the character of the one made by a board member was justified may also be seen from even a casual inspection of appellant's selective service file record before us on this appeal.

At appellant's personal hearing on December 10, 1951 the local board had available in his file a Classification Questionnaire filed by him on July 6, 1949. In this formal document he averred that he was (then) "a student *preparing* for the ministry * * * in a theological or divinity school at Odessa, Texas under the direction of The Watch Tower Bible & Tract Society." He further stated therein that he was (then) *regularly serving as a minister* and had been a minister *since September 19, 1942.* To another form question he answered, "I have been a minister of the Jehovah Witnesses since September, 1942," and "I do *regularly* serve as a minister." As to his *vocation* he stated that he was an apprentice mason learning the mason trade. (Emphasis supplied)

The minutes of the local board meeting on December 10, 1951 recite inter alia that "the boy said the Jehovah Witness' consider themselves followers of Christ and HE *didn't* attend Theological or Bible Colleges." (Emphasis supplied)

In his 1949 Questionnaire he also set forth that he had been formally ordained as such by "Brother J. Davis" at Klamath Falls, Oregon on September 19, 1942. The claim before the board on December 10, 1951 that he had *not attended* a divinity school obviously presented a contradictory and confusing argument when measured against his defi-

nite claim made in the above noted Questionnaire of 1949.

In the 1949 Questionnaire he gave his date of birth as March 29, 1930 which indicates that he was approximately twelve years of age in September of 1942 at which time he claims to have been "ordained" as a minister.

As a result of appellant's appearance before the local board on December 10, 1951 it classified him 1-A. He appealed this classification on December 19, 1951 listing two grounds (1) that he was a minister and (2) that he was conscientiously opposed to participation in war.

On January 10, 1952 the Appeal Board classified him 1-O (as above indicated).

On September 17, 1952 appellant filed his Special Report for Class 1-O Registrants in which he listed various jobs he had held since April 1, 1949. He set forth that he was *still employed* by Milan and Lund, brick contractors, *as an apprentice bricklayer.*

On October 23, 1952 he filed an Apprentice Deferment Request.

On February 24, 1953 the local board requested appellant to indicate his preference of three jobs which it had approved. He replied by letter stating that *he applied for deferment as an apprentice bricklayer* and that he declined to take any other occupation "than my present one."

Later and on August 12, 1953, appellant appeared for a second time for a hearing before his local board. The minutes of the board meeting do not indicate that he discussed his ministerial claim at that time. However, on October 22, 1953 he addressed a letter to the local board about his 1-O classification, stating that he had new evidence which merited attention; that he was then an "Area Study Conductor" one of the du-

ties of this post being the teaching of Bible Study to an adult class. In this letter he added the significant statement that "my wife and I *are planning now so that by next summer* [the summer of 1954] we will be able *to enter the full time ministry* and devote 100 hours a month each *in regular preaching activity.*" (Emphasis supplied) As before, the local board had before it his formal claims that in July, 1949 he had been "regularly serving as a minister" since 1942, while in October of 1953 he was "planning" to engage "in regular preaching activity * * * by next summer." The paradoxical claims of "regularly serving as a minister" since 1942, while also asserting in October of 1953 that he was "planning to engage in regular preaching activity * * * by next summer" were certainly sufficiently confusing and contradictory to suggest to a board member that at least an inquiry into the true posture of facts in his case was justified. It was this scrutiny of his file record and the inquiry it engendered that appellant now decries as "unfair" and a procedure that "taints" the entire selective service process in his case.

On November 4, 1953 the local board "reviewed the complete file" of appellant and did not change the 1-O classification which had earlier been fixed by the Appeal Board.

On February 15, 1954 appellant was ordered to report to his local board on February 25, 1954 for instructions to proceed to his place of employment.

On February 23, 1954 he acknowledged by letter the receipt of this local board order and in his letter requested a (third) personal appearance coupled with the request that the board classify him as a minister.[2]

2. He testified at his trial that in February of 1954 he was working *full time* as a bricklayer, and that *not until September of 1954* did he and his wife "enter into full time ministry work." Furthermore, (and below noted) he had enjoyed two personal appearances before the local board, and by letter requested a third personal appearance which request was received one day *after* he had failed to report for instructions. We perceive no denial of procedural "due process" when the local board acted (as it did) within the framework of the law and regulations when it assigned this conscientious objector to civilian work.

This letter also contained the bare charge that denial of ministerial status was due to "prejudice," but he did not attempt to define what he meant by the use of this term. However, it is abundantly clear from all of his arguments that the charge of "prejudice" was based on the above noted question by a local board member, and that asking the question indicates that an "artificial standard" in classifying him was applied by *both* the local and the Appeal Board, to which question we later refer.

The request of February 23, 1954 for another and third personal appearance before the local board was not received by that board until February 26, 1954, *one day after appellant had failed to report to the local board for instructions, as ordered.* (See footnote 2.)

We have been at pains to present the salient and pertinent facts revealed by appellant's file which was before the trial court.

In his brief appellant concedes that he makes his living by secular work, but urges that his testimony leaves no doubt that he devoted as much time to his ministry as do many clergy of other sects, hence it (his ministry) *was his vocation.*[3] In summary, the argument in his brief is that he was *considered a minister by numerous persons* and that he "regularly gave substantial amounts of time to this work"; that his secular activities were "only to support his family" and again avers that the denial of his ministerial claim was *based* on his lack of college or theological training.

There is a short reference in his brief to the action of the Appeal Board in classifying him 1-O in which appellant makes the bare assertion that the Appeal Board "ignored" his claim to a minister's classification, as a consequence of which *its* classification (1-O) was "arbitrary." He suggests that this classification *indicated* that such action "involved" the fact tha⁺

---

3. The law, Selective Service Act of 1948, as amended, Sec. 16(g) (3), 50 U.S. C.A.Appendix, § 466(g) (3) provides as follows: "The term 'regular or duly ordained minister of religion' *does not include* a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization *and does not include* any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, *but who does not regularly, as a vocation,* teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization." (Emphasis supplied.)

We are convinced that there was a "basis in fact" for the determination reached by the Appeal Board in classifying appellant 1-O. His file, and his contradictory documentary evidence before the local board and the Appeal Board fully justified the final conclusion of the selective service authorities that his *vocation* was that of a bricklayer at the time he was ordered to perform civilian work. (See footnote 2.)

The Supreme Court has pointed out in the prevailing opinion in Dickinson v. United States, 346 U.S. 389, 74 S.Ct.

152, 156, 98 L.Ed. 132, that "preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed", or in other words, be his *vocation.* The Court further pointed out that "the selective service registrant bears the burden of clearly establishing a right to the exemption." It should be pointed out that we are not here faced with a situation where appellant was merely doing "some secular work" in order to survive—his own candid admission is that he was doing full-time secular work as a bricklayer at the time he was ordered to report to his local board and that he failed to report. He merely sought more delay.

His ministerial claims stand disputed by documentary and affirmative evidence supplied by him and selective service officials were certainly justified in taking him at his word. This argument for reversal of the conviction is without merit.

He also frankly argues in his brief that he "presented satisfactory evidence that he was a conscientious objector." He was so finally classified and there is ample basis in fact to sustain that classification.

the *local board's* "artificial standards" (no college or theological seminary) was also *used* by the Appeal Board. As we have indicated above, absolutely nothing appearing in the file record lends support to appellant's bald assumption that the Appeal Board deliberately adopted the Kezmes "basis" in classifying him.

Appellant also advances the argument in his brief that *if* the oral "explanation" he gave in his testimony at trial on September 8, 1954 had been *heard* by the local board its 1951 classification (1-A) *might* have been different. And he suggests, by way of an argumentative conclusion, that *"this explanation,"* i. e., the 1954 court testimony, was *absent* from the "summary" before the Appeal Board. His specific argument is that the appeal record omitted such a summary, and that such omission was due to the "time limit" imposed by the local board which in turn was "an unfair diminution of his appellate record."

By use of the term "this explanation" we must assume that he refers to this additional 1954 "explanation" which he gave in court approximately two years and nine months later, as the kind of *oral testimony* he *would have added* to his "fifteen minutes" of written statement which he tendered to the board in 1951 as his "testimony," had the board been willing to receive additional oral comment on the formal statement. By viewing in retrospect the proceedings in December of 1951, he apparently would have us *add* to the written statement then made, the oral arguments later presented at trial in 1954.

This Court cannot re-write appellant's 1951 written testimonial claims for ministerial exemption. The local board could act only on the information as of the date when it was called upon to classify him. Obviously, and in any event, the court-voiced assertions as to his later activities, or his 1954 view of the character of his claimed ministerial activities, could not have been incorporated in the 1951 prepared statement. His contention here seems to be that he was denied a right because the local board failed to prepare a "summary" of what he avers in 1954 to be the things he *wanted to say* to the local board in 1951 by way of *amplification* of his written statement (which he called his "testimony") concerning his (then) ministerial activities. Only by sheer legerdemain could this Court reach back and deliberately write this then unspoken argument into his 1951 board record. Certainly the local board had a right to accept his representation that the 1951 prepared statement was his "testimony" presenting his then claim to ministerial exemption.

This written statement of December 10, 1951 was duly incorporated in full in his selective service file and a photostatic copy of the entire statement appears in the file record before this Court and the lower court.

We find nothing in his selective service file which calls for or would justify the conclusion that this written "fifteen minute" statement presenting the ministerial exemption argument he *then* wanted to read to the local board, was omitted in any part from his file record when that record was transmitted to the Appeal Board for review. The "Individual Appeal Record" (SSS Form 120) executed by the local board sets forth that the appeal was forwarded to the Appeal Board on December 19, 1951, and it is also therein stated that appellant "requested ministerial status." Thus, his claim for ministerial exemption was squarely placed before the Appeal Board exactly as he expressed it in what he called his testimony contained in the written statement filed with the local board.

On January 10, 1952, the Appeal Board unanimously placed appellant in class 1-O. At a later point we refer to his 1954 testimony in court.

As his brief here and his testimony adduced at trial clearly indicate, his case is really bottomed on the contention that he was denied procedural due process because his local board (on December 10, 1951) foreclosed his right to "explain about our ministry work and minister schools * * * how we learn to become speakers and better ministers. I

had fifteen minutes *prepared*." (Emphasis supplied) He told the lower court that he had not talked very long when "they asked me some questions"; that "they changed the subject," and that he did not have the opportunity to explain the details of his work. His court testimony of 1954 reveals that he therein claimed that he was then spending one hour a week "mostly as a teacher" in directing a class the preparation for which task consumed from an hour to an hour and a half.

He also testified that he was then engaged in "publishing" which means preaching to people "at the people's doors," and that this work took about five hours a week. He also testified that in April of 1952 he became an "Area Study Conductor" and that in February, 1954 he was appointed as "Assistant Congregation Minister" which post called for preaching to people "in their homes" in an "exclusive territory." People being so visited were identified as "a congregation" composed of people not members of the Jehovah's Witnesses sect.

However, on cross-examination appellant testified that in February of 1954 he was working *full time* as a bricklayer; that *not until* September of 1954 did he and his wife "enter into full time ministry work." He admitted that he was supposed to "report for work" on February 25, 1954, and that he did not "report" but "mailed a letter" on the 24th which he intended "to get there" on the 25th; that up to that time he had made no request to reopen his classification on the basis that he was an Assistant Congregational Servant.

Because of the stress placed upon the aspect of his case relating to the *time* allowed him in his personal hearing before the local board on December 10, 1951, we return to the file record minutes of the board which show that the chairman told him that he would be given five minutes to present his case. This record sets forth that appellant then advised the local board that he *"would leave the testimony* which he had along with him [in written form] for the board to review."

The minutes also show his oral statement that he "delivered sermons" and "has 2 Bible Studies, in various homes, a week." (Emphasis supplied)

This Court and the lower court could and did examine this written "testimony" which he thus wanted the board to "review." Having been prepared in advance of the hearing we must and do assume that this statement sets out the fifteen minute argument which he now says he wanted to *read* to the board and which he then considered pertinent and sufficiently enlightening to represent his exact position and claims. Aside from an argument, there is no showing that he was denied or failed to exercise the privilege of fully expressing therein any and all additional pertinent claims, or that he omitted to set them forth in this prepared testimonial statement. Nor is there any showing in the record that the local board did not "review" his written "testimony," as he requested. If any presumption attaches, it is that the board did that very thing in the performance of its official duties. The record discloses no evidence which causes us to doubt that the board did "review" this "testimony."

He begins this written "statement" for the local board with the comment that *"the following is my testimony."* The document covers several typewritten pages and we endeavor to fairly summarize and paraphrase its salient arguments. It sets forth generally that beginning in 1943 I enrolled in the Theocratic Ministry School wherein we prepare sermons on various Bible subjects; we have regular lessons in different text books (naming them); in the past eight years (i. e., since 1943, at which time he was about 13 years of age) I have regularly engaged in the house to house preaching activity as well as street work and Home Bible Studies all of which we consider to be the *most effective manner of performing* our ministerial obligations; that as *proof* (i. e., of the preaching activity) I cite (here follows a long list of quotations from the Scriptures which he asserts *describe* the activity that Christian Ministers must perform); that "my

stand is one of complete neutrality and thus in opposition to participation in wars between nations, and it would be wrong for me to take any part in any war although I am not a pacifist." (Emphasis supplied)

Appended to the "statement" is a so-called "certificate" signed by thirty persons in which they "certified" that they "recognized" appellant as one who regularly engages in preaching activity—and believe him to be sincere in his objection to engaging in participation in war. So far as the record shows these signers appear to be laymen and not church or sect officials.

In his brief appellant has been at pains to carefully summarize for us the substance of his argument that *the local board* failed to give him a "fair hearing." He urges that registrants are entitled to fair hearings before their local boards and that a hearing deliberately limited to five minutes, of which two minutes is consumed by the board's members, is unfair because a registrant has an unusually heavy burden of proof and that he had "prepared fifteen minutes of relevant material for *presentation*."

Nothing in the record justifies the conclusion that this "prepared fifteen minutes of relevant material for presentation" did not contain a fair summation of the "relevant material" which he wanted to *read* to the board. And only by a diligent and inexcusable exercise of our imaginative powers could we infer or possibly conclude that the board refused to read, or did not read, the statement left with it since nothing in the record so indicates. Mere conjecture and suspicion suggested only by way of argument cannot be accepted as a substitute for proof, nor do they provide (as he suggests) tangible evidence or a basis in fact for assuming that the hearing and the later appeal process was fatally "tainted" to a degree which calls for reversal of the judgment of the lower court.

He further asserts "even if the local board is unconvinced, it should so handle the situation [reopen] so that the registrant has an opportunity for an appellate determination," hence "appellant was denied due process in both of the above instances."

■ The most vital aspect of this case is not shrouded in doubt. The contentions of appellant in oral argument and in his brief make conclusively clear that the heart and soul of his case finally finds expression in the contention that rejection of his two-fold claims by the local board and his later and more favorable classification by the Appeal Board, were *wholly induced* by the "view" of both boards that he could not be placed in either classification "apparently because [to quote his brief] he had not attended or graduated from a recognized Theological Seminary or Bible Institute." If we strip this heavily emphasized argument from his case it falls by its own weight for the records stamps it as an assumption without the slightest evidentiary support.

Appellant's last contention of any substance was advanced as a further ground for reversal of the judgment of conviction. This is the claim that the "work program" to which he was assigned "suffers from constitutional and related infirmities." Specifically, he argues that the Selective Service Act and/or Regulations, as construed and here applied, do violence to his rights under the First, Fifth, Thirteenth and Fourteenth Amendments to the Constitution in that they (and the board order) call for a private non-federal labor draft which would require performance of services that are not exceptional or related to the national defense.

■ There is a short answer to this sweeping indictment. This Court has previously passed upon a similar and closely related contention and rejected it as being without merit. Niles v. United States, 9 Cir., 220 F.2d 278 affirming a judgment of the lower court in United States v. Niles, 9 Cir., 122 F.Supp. 382. A petition for certiorari to this Court in the Niles case was denied on May 23, 1955, 349 U.S. 939, 75 S.Ct. 784.

Appellant does not indicate in his briefs any reason for departure from the general doctrine announced in our Niles' decision nor does he even refer to that opinion. We think that the rationale of that decision calls for rejection of a contention based on the stated constitutional grounds. Certainly no sound reason exists for this Court to attempt, on vague and tenuous grounds, to override and set at naught the entire civilian work program which is exactly what appellant would have us do.

We are convinced that appellant had a fair trial, and that on the entire record his classification as 1-O had a substantial basis in fact. The judgment of conviction should be and is affirmed.